UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Terry Thomas

      v.                                    Civil No. 1:07-cv-385-JL
                                                Opinion No. 2012 DNH 058
Warden, N.H. State Prison


### OPINION AND ORDER

The petitioner, Terry Thomas, seeks habeas corpus relief
from his state-court convictions for receiving stolen property,
claiming a violation of his Sixth Amendment right to counsel and
other constitutional violations.  The respondent, the Warden of
the New Hampshire State Prison (the "Warden"), has moved for
summary judgment, see Fed. R. Civ. P. 56, arguing that all of
Thomas's claims lack merit and that he failed to properly exhaust
his state-court remedies as to at least one of them.  Thomas has
cross-moved for summary judgment in his favor.

This court has jurisdiction over Thomas's petition under the
Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),
28 U.S.C. § 2254(a).  After oral argument, the court grants the
Warden's motion for summary judgment and denies Thomas's cross-
motion for summary judgment.  As discussed fully infra, none of
Thomas's claims can support habeas relief as a matter of law.

## I.   __Applicable legal standard__

"In civil matters including habeas, evidentiary proceedings are appropriate only where the party bearing the burden of proof . . . starts with enough evidence to create a genuine issue of fact; otherwise summary judgment is proper." Bader v. Warden, N.H. State Prison, 488 F.3d 483, 488 (1st Cir. 2007); see also Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (when the state court record "precludes habeas relief" under the limitations of § 2254(d), "a district court is not required to hold an evidentiary hearing").  Thomas bears the burden of proof on his claims for habeas relief.  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

Under AEDPA, "a federal court [can] entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States.'"[1] Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011) (quoting 28 U.S.C. § 2254(a)).  AEDPA further "provide[s] that a federal court may not grant such applications

---

[1]"Custody" under the federal habeas statute is determined at the time the petition is filed.  Maleng v. Cook, 490 U.S. 488, 491 (1989); Carafes v, LaVallee, 391 U.S. 234, 238 (1968); Tinder v. Paula, 725 F.2d 801, 803 (1st Cir. 1984).  Thomas is no longer in custody, but he was at the time he filed his petition here.

unless, with certain exceptions, the applicant has exhausted state remedies." Id.

If a habeas application includes a claim that has been "adjudicated on the merits in State court proceedings," § 2254(d), then the court must employ a "highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt" with respect to that claim. Woodford, 537 U.S. at 24 (internal quotation marks and citation omitted). Under § 2254(d), a federal court cannot grant habeas relief with respect to a claim that was adjudicated on the merits in state court unless adjudication of the claim resulted in a decision that (i) "was contrary to" clearly established federal law, as determined by the Supreme Court of the United States, (ii) involved an "unreasonable application of" clearly established federal law, or (iii) was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A claim is presumed to be "adjudicated on the merits" when it has been presented to a state court and the state court has denied relief, even if the state court does not provide its reasoning. See Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784-85 (2011). On the other hand, when it is clear that the "[state] courts did not reach the merits of [the petitioner's

constitutional] claim, federal habeas review is not subject to the deferential AEDPA standard; "[i]nstead, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 129 S. Ct. 1769, 1783 (2009); see also Wright v. Marshall, 656 F.3d 102, 107-08 (1st Cir. 2011).

## II.  **Background**

In 1999, Thomas was charged with seven counts of receiving stolen property.  See N.H. Rev. Stat. Ann. § 637:7.  Mona Igram, of the New Hampshire Public Defender's office, was assigned to represent him.  In January 2000, Thomas sought to dismiss Igram and requested new counsel be appointed to act as "co-counsel" with him in his defense.  The trial court granted this relief. Over the next 16 months, Thomas repeatedly sought and was appointed new "co-counsel."  Eventually, after appointing at least four different lawyers to this role, the court denied Thomas's motion to replace his then current co-counsel, Jane-Holly Weintraub.  Thomas opted to proceed pro se with Weintraub acting as his standby counsel.

In May 2001, following a jury trial in Hillsborough County Superior Court, Thomas was convicted on three counts of receiving stolen property.  He was later sentenced to three concurrent

4

terms of three and one-half to seven years in prison on each
count and was ordered to pay restitution.

The following month, Thomas, proceeding pro se, appealed his
convictions to the New Hampshire Supreme Court ("NHSC").  In the
notice of appeal, Thomas raised several constitutional claims,
including that the trial court erred in allowing him to proceed
pro se and in denying his request for a transcript of a
suppression hearing.  Deputy Chief Appellate Defender David
Rothstein, also of the Public Defender's Office, subsequently
appeared as Thomas's appellate counsel.

Acting on his own behalf, Thomas later filed a request with
the NHSC to proceed pro se on appeal and to dismiss Rothstein as
his counsel because he "has not/is not providing reasonably
effective assistance of counsel."  Ex. N. at 8.  Thomas argued
that Rothstein had refused to pursue numerous appellate issues
Thomas had identified.  Thomas further argued that Rothstein had
a conflict of interest because Thomas had filed professional
conduct complaints against various public defenders, including
Igram.  At the NHSC's request, Rothstein submitted a brief on
whether Thomas had the right to proceed pro se on appeal.  Ruling
that he had no such right, the NHSC ultimately denied Thomas's
request to proceed pro se and affirmed his convictions.  See
State v. Thomas, 150 N.H. 327 (2003).

Thomas then filed a motion in the Superior Court for post-conviction relief, i.e., a judgment of acquittal or, in the alternative, a new trial.  The court denied the motion without a hearing.  Thomas then filed a notice of discretionary appeal of this decision with the NHSC, alleging, among other claims, ineffective assistance of both trial counsel and appellate counsel and that the state knowingly withheld exculpatory evidence.  In response, the state argued that Thomas was entitled to a hearing on his claims of ineffective assistance of trial counsel and withholding of evidence only.  The NHSC agreed, remanding the matter for a hearing on those issues.  After the hearing, the Superior Court rejected Thomas's claims.  He then filed a notice of discretionary appeal of this decision with the NHSC, which declined to hear the appeal.

Prior to filing his second discretionary appeal, Thomas, proceeding pro se and in forma pauperis, filed a petition for a writ of habeas corpus in this court seeking relief from his convictions.  Thomas's petition included approximately 136 federal constitutional claims (34 numbered claims, some with numerous lettered subparts).  Following preliminary review, Magistrate Judge Muirhead recommended that 12 of the claims be dismissed but that the rest be allowed to proceed.  The Warden eventually moved for summary judgment on these claims.

In light of the unusually large number of claims surviving preliminary review, the court appointed counsel to represent Thomas.  <u>See</u> 18 U.S.C. § 3006A(a)(2)(B).  The court also suspended its review of the pending summary judgment motion to allow appointed counsel an opportunity to review the case file, meet with Thomas, and file a notice with the court delineating which claims he intended to pursue, and which he waived.  Counsel did so, eventually filing a notice with the court setting forth five "non-frivolous" claims he intended to pursue.[2]  The Warden then moved for summary judgment on those claims.  Thomas objected and filed a cross-motion for summary judgment.

## III. <u>Analysis</u>

Thomas's remaining claims are as follows:

(i)    he was denied his Sixth Amendment right to counsel because the trial court allowed him to waive it, and to go to trial pro se, without conducting an adequate colloquy;

(ii)   the trial court violated his due process rights when it denied his request for a transcript of the suppression hearing;

---

[2]The court appreciates appointed counsel's service to the court, which greatly facilitated the court's review of the claims at bar.  At oral argument, the petitioner noted that he was satisfied with appointed counsel's service and performance in this matter.

(iii)   the trial court denied what he sees as his
        constitutional right to make an opening
        statement;

(iv)    the trial court denied his Sixth Amendment right
        to effective assistance of counsel when it
        refused to allow his standby counsel, Weintraub,
        to withdraw despite an actual conflict of
        interest; and

(v)     he was deprived of the effective assistance of
        appellate counsel because his appellate counsel,
        Rothstein, had a conflict of interest.

As explained fully <u>infra</u>, these claims are without merit.

## A.    Claims adjudicated on the merits

On Thomas's direct appeal, the NHSC considered and rejected

his claims concerning his waiver of his right to counsel at trial

and the trial court's denial of his request for the transcript of

the suppression hearing.  Therefore, these two claims were

"adjudicated on the merits" and are reviewed under AEDPA's

deferential standard.  See Part I, <u>supra</u>.

The court first determines whether the NHSC's decision "was

contrary to" clearly established federal law, as determined by

the Supreme Court.  A state court decision is "contrary to"

established Supreme Court precedent if either the state court

reaches a conclusion on a question of law "diametrically

different" to that reached by the Supreme Court, or a state court

"confronts a set of facts that are materially indistinguishable"

from relevant Supreme Court precedent and reaches an opposite result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

If the NHSC's decision was not "contrary to" clearly established federal law, the court next determines whether the decision involved  an "unreasonable application of" clearly established federal law.  § 2254(d).  A state court decision is an "unreasonable application" of clearly established federal law if the state court (i) "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts" of a prisoner's case, (ii) "unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply" or (iii) "unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see also L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002).  In order to meet this standard, the state court's application of law must contain "some increment of incorrectness beyond error . . . .  The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (internal quotation marks and citation omitted).

If the state court decision was not "contrary to" or an "unreasonable application of" clearly established federal law,

9

the court next considers whether the decision was based on an
"unreasonable determination of the facts in light of the evidence
presented in the State court proceeding." § 2254(d).
Determinations of fact made by the state court are presumed to be
correct; the petitioner has the burden of rebutting this
presumption of correctness by clear and convincing evidence. See
§ 2254(e)(1); Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir.
2007). "The question under AEDPA is not whether a federal court
believes the state court's determination was incorrect but
whether that determination was unreasonable—a substantially
higher threshold." Schriro, 550 U.S. at 473 (internal citation
omitted). Furthermore, "[t]he 'presumption of correctness is
equally applicable when a state appellate court, as opposed to a
state trial court, makes the findings of fact.'" Norton v.
Spencer, 351 F.3d 1, 6 (1st Cir. 2003) (quoting Sumner v. Mata,
455 U.S. 591, 593 (1982)).

### 1.   Thomas's waiver of the right to counsel at trial

Thomas argues that the trial court failed to conduct an
adequate colloquy before allowing him to represent himself, as
required to determine whether his waiver of his right to counsel
was knowing and intelligent, under Faretta v. California, 422
U.S. 806 (1975), and related cases. He contends that although

10

the record reflects that he expressed a desire to represent himself, it does not reflect that he was capable of, or understood the risks, of doing so.  In moving for summary judgment, the Warden argues that the NHSC properly applied Faretta to conclude, reasonably, that Thomas's waiver of his right to counsel was knowing and intelligent.  This court agrees.

In rejecting Thomas's claim that the trial court failed to conduct a sufficient colloquy before accepting his waiver of counsel, the NHSC found that "the trial court judges made the defendant aware of the dangers and disadvantages of self-representation."  Thomas, 150 N.H. at 329 (internal quotation marks and citation omitted).  The court further ruled that "[w]hile we strongly prefer that trial court judges conduct an inquiry with a defendant who wishes to waive his right to counsel . . . the trial court in this case had sufficient evidence to conclude that the defendant's waiver was valid."  Id. at 329-30 (internal quotation marks and citation omitted).  The court therefore ruled that Thomas's waiver was "knowing, intelligent and voluntary."[3]  Id. at 329.

───────────────

[3]The NHSC analyzed this claim under the state constitution, but also indicated, without setting forth a separate analysis, that it would reach the same result under the federal Constitution.  See Thomas, 150 N.H. at 330.

Thomas explained at oral argument that he does not challenge this ruling as "contrary to" clearly established federal law.  He concedes, in fact, that the NHSC applied the correct legal standard, from Faretta.  See, e.g., Ellen v. Brady, 475 F.3d 5, 12 (1st Cir. 2007) (state court's decision was not "contrary to" federal law because "[t]he state court . . . accurately stated the governing federal law").  He argues, however, that the NHSC's decision on this claim was both an "unreasonable application of" federal law and an "unreasonable determination of the facts."  Indeed, the court of appeals has recognized that "the question of whether the petitioner made a knowing, intelligent and voluntary waiver of his right to counsel in state court" will ordinarily be reviewed "under § 2254(d)(1)'s 'unreasonable'" clauses."  Yeoboah-Sefah v. Ficco, 556 F.3d 53, 68 (1st Cir. 2009) (citing Williams, 529 U.S. at 409).  Here, the NHSC's decision that Thomas made a valid waiver of his right to counsel was neither an unreasonable application of law nor an unreasonable determination of fact.

### a.   Unreasonable application of federal Law

The Supreme Court has held that a defendant may waive his right to counsel and represent himself so long as he "knowingly and intelligently forgo[es] [the] relinquished benefits" of the right to counsel.  Faretta, 422 U.S. at 835 (internal quotation

12

marks and citation omitted).  A defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Id. (internal quotation marks and citation omitted).  Thus, before a trial judge may accept a defendant's waiver of his right to counsel, he must determine "whether there is an intelligent and competent waiver by the accused," and "must investigate as long and as thoroughly as the circumstances of the case before him demand." Schneckloth v. Bustamonte, 412 U.S. 218, 244 & n.32 (1973) (citing Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)).

Thomas concedes that "the court made an effort to describe the dangers of proceeding pro se." Pet. Obj. at 11.  Therefore, he does not challenge the NHSC's ruling that "the trial court judges made the defendant aware of the dangers and disadvantages of self-representation." Thomas, 150 N.H. at 329.  Instead, he argues that "the court did not conduct a sufficient colloquy with [him] to ensure he . . . had the ability to represent himself." Id. at 6.

Thomas invokes the Supreme Court's Von Moltke opinion for the proposition that "[a] judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination

13

of all the circumstances under which such a plea is tendered."
332 U.S. at 724.  This principle, however, does not mandate the
most searching colloquy imaginable in every case where a
defendant announces his intention to proceed pro se.  Instead, as
just discussed, the trial judge "must investigate as long and as
thoroughly as the circumstances of the case before him demand."
Schneckloth, 412 U.S. at 244 n.32 (emphasis added).  Indeed,
"there are no clearly established Supreme Court decisions bearing
directly on the constitutional requirements for an adequate
[counsel] waiver colloquy."  Yeboah-Sefah, 556 F.3d at 68 (citing
21A Am. Jur. 2d Criminal Law § 1153 (2008) ("no particular
cautionary instruction or form [by court] is required to ensure
the validity of [defendant's] waiver" of right to counsel)).  So
this court must take the flexibility of this standard into
account in considering the reasonableness of the NHSC's
application of Faretta.  See Richter, 131 S. Ct. at 786
("[e]valuating whether a rule application was unreasonable
requires considering the rule's specificity.  The more general
the rule, the more leeway courts have in reaching outcomes in
case-by-case determinations.") (internal quotation marks and
citation omitted).

Viewed in this light, the NHSC's decision that Thomas had
validly waived his right to counsel was not an unreasonable

application of federal law.  By the time his case proceeded to
trial, several different judges had explained to Thomas the risks
and responsibilities of his decision to proceed pro se and
afforded him the opportunity to reconsider that decision.  In
light of this history, if nothing else, the NHSC's conclusion
that the trial court had a sufficient basis to find a knowing and
intelligent waiver of Thomas's right to counsel was not "so
lacking in justification that there was an error well understood
and comprehended in existing law beyond any possibility for
fairminded disagreement" so as to amount to an unreasonable
application of federal law.  Richter, 131 S. Ct. at 786-87.

> **b.    "Unreasonable Determination" of the Facts**

Thomas also challenges the NHSC's factual findings that his
waiver of counsel was "knowing, intelligent and voluntary."
Thomas, 150 N.H. at 329.  The record, however, demonstrates that
this finding was not unreasonable.

Thomas argues that even if he did indicate an understanding
and acceptance of the responsibilities of proceeding pro se, the
waiver was not knowing or intelligent because he was incapable of
representing himself.  In support, he contends that he informed
the trial court that "he was not capable of objecting and
enforcing the rules of evidence."  Pet. Obj. 11.  At oral

argument before this court, however, Thomas specifically stated that he had been capable of representing himself at trial; he just needed better assistance from his standby counsel.  In addition, although Thomas did express his lack of familiarity with the rules of evidence to the trial court, that did not serve to invalidate his waiver of his right to counsel.  See Faretta, 422 U.S. at 836 ("We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule . . . .  For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of his right to defend himself."); see also United States v. Kneeland, 148 F.3d 6, 12 (1st Cir 1998) ("[a]n intelligent waiver does not require that the accused have the skill or knowledge of a lawyer") (internal citation omitted).

Thomas also challenges the NHSC's finding that his waiver of counsel was voluntary.  He argues that he felt forced to proceed pro se because his only other option was to proceed with an attorney, Weintraub, whom he felt he had a conflict of interest.  As just discussed, however, the record reflects that over an approximately one year period prior to trial, Thomas repeatedly sought and was granted the appointment of new counsel.  The trial court assigned each of these attorneys as Thomas's "co-counsel," which afforded Thomas the benefit of representation while

16

retaining the chance to personally question witnesses and conduct
other aspects of his own defense.  Just before his trial was
scheduled to begin, Thomas again sought to replace his co-
counsel, who at that point was Weintraub.  Thomas informed the
trial court that if it denied this relief, he would dismiss
Weintraub and proceed pro se, but would nevertheless request the
appointment of standby counsel (as opposed to co-counsel).  The
court denied Thomas's motion to appoint new co-counsel in
Weintraub's stead, and, after Thomas confirmed that he desired to
proceed pro se, appointed Weintraub as his standby counsel.

     At a subsequent hearing, Thomas sought to replace Weintraub
as his standby counsel.  The trial court denied his request,
finding that it was a delaying tactic, and gave Thomas the choice
between retaining his current standby counsel or proceeding
without any standby counsel.  Thomas opted to retain Weintraub as
his standby counsel, and tried the case pro se.

     On the record as a whole, the NHSC's finding that the trial
court secured a voluntary waiver of counsel was not unreasonable.
Indeed, Thomas asserted on numerous occasions that he desired to
proceed pro se, even after multiple judges had explained the
responsibilities, dangers, and disadvantages of self-
representation, and afforded Thomas numerous opportunities to
reconsider his decision.  It is therefore difficult to take

17

seriously Thomas's claim that he was "forced" into doing essentially the same thing--handling his own defense at trial--he had been consistently trying to do all along.

This is not to say that this court disagrees with the NHSC's observation that it would have been preferable for the trial court judges to conduct a more intensive inquiry with Thomas before allowing him to proceed pro se. But, as the NHSC reasonably concluded, the trial court's failure to do so was not constitutional error. Accordingly, the Warden is entitled to summary judgment with respect to Thomas's claim that he was denied his Sixth Amendment right to counsel when the trial court accepted his waiver of that right.

**2.  Thomas's right to the suppression hearing transcript**

Thomas argues that the trial court violated his constitutional right to due process and a fair trial under Britt v. North Carolina, 404 U.S. 226 (1971), by denying his request for a transcript of the suppression hearing. In moving for summary judgment, the Warden argues that the NHSC's application of Britt was not unreasonable and that an audiotape of the suppression hearing, to which Thomas had access, was an adequate alternative to a transcript. The court agrees that the NHSC's application of the factors in Britt was not unreasonable. In

addition, even if the trial court's decision not to provide a transcript was a violation of Thomas's constitutional rights, Thomas would not be entitled to habeas relief because the error was harmless.

The record shows the following facts:  On December 12, 2000, the trial court held a hearing on Thomas's motion to suppress statements and evidence obtained at the scene of his arrest.  The court denied the motion.  On January 5, 2001, the court denied Thomas's motion for an expedited transcript of the suppression hearing.  At a hearing three weeks later, the court granted Thomas's request to listen to the audiotape of the suppression hearing.  The court subsequently granted Thomas's request for additional time to listen to the tape of the hearing.

On March 7, 2001, after the deadline to move for reconsideration of the denial of the motion for a transcript had passed, Thomas orally moved for the court to reconsider its decision.  The court informed Thomas that he had not "articulated any reason for us to have a transcript made."  Hr'g Tr. 37, Mar. 7, 2001.  After Thomas responded that his reasons were provided in his original motion to obtain a copy of the transcript, the court explained that it had already considered those grounds and found them wanting.  Nevertheless, the court gave Thomas and his standby counsel an opportunity to listen to the tape of the

hearing for a second time, and granted Thomas's request to listen to the tape without standby counsel present.

After getting these opportunities, however, Thomas did not renew his request for a copy of the suppression hearing transcript or complain to the court about the adequacy of the tape as an alternative.  Thomas did not bring the issue of the transcript to the court's attention again until the third day of trial when, while attempting to impeach a witness, he complained to the court that it was a "real problem" that he did not have a transcript.  Trial Tr. vol. 3, 156, May 9, 2001.

The NHSC considered and rejected Thomas's claim that the trial court's refusal to provide the transcript was unconstitutional.[4]  Thomas explained at oral argument in this court that he does not challenge this decision as "contrary to" federal law or as an "unreasonable determination of the facts," but only as an "unreasonable application of" clearly established federal law.  It was not but, even if it was, it is surely not the reason that Thomas was convicted.

_____

[4]The NHSC again analyzed the claim under the state constitution, but ruled that it would reach the same result under the federal Constitution.  See Thomas, 150 N.H. at 331.

### a.   "Unreasonable application of" federal law

The state, upon request, must provide indigent defendants-- without cost--with the "basic tools of an adequate defense . . . when those tools are available for a price to other prisoners." Britt, 404 U.S. at 227; see also Ross v. Moffitt, 417 U.S. 600, 612 (1974); Griffin v. Illinois, 351 U.S. 12, 23 (1956). Yet the state need not provide indigent defendants with all the assistance money can buy; rather, due process requires that the state not deny them "an adequate opportunity to present their claims fairly within the adversary system." Ross, 417 U.S. at 612; see also Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

Consistent with that principle, the Supreme Court has held that "the State must provide an indigent defendant with a transcript of prior proceedings when the transcript is needed for an effective defense or appeal." Britt, 404 U.S. at 227. The Court "identified two factors that are relevant to the determination of need:  (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." Id. As to the first factor, the Supreme Court has held that a defendant need not make a particular or strong showing of the value of the transcript. Id. at 228 ("even in the absence of specific

allegations it can ordinarily be assumed that a transcript . . . would be valuable to the defendant in at least two ways:  as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses").  As to the second factor, the Supreme Court has held that the adequacy of alternative devices should be decided on a case-by-case basis, depending on the facts and circumstances of each case.  See id. at 229.  In rejecting Thomas's claim arising from the denial of the transcript, the NHSC rested its decision on this second factor.  Specifically, the NHSC noted that Thomas had access to the audiotape of the suppression hearing and that, after having the chance to review it, he failed to complain to the trial court as to its adequacy.  150 N.H. at 331.

In challenging this conclusion, Thomas argues, in essence, that the tape's inadequacy did not become apparent until he "attempted, unsuccessfully, to impeach [a witness] at trial, without benefit of a transcript."  But, as just discussed, the rule set forth in Britt is not that an indigent defendant is entitled to the transcript of a hearing simply because it can be used for impeachment.  To the contrary, the Court specifically recognized that, while a transcript is almost always valuable in that sense, denying a defendant access to one rises to the level of a due process violation only in circumstances which make the

22

alternatives inadequate.  Thus, the lack of a transcript itself does not automatically deprive a defendant of an effective defense, even where it could have been used to impeach a prosecution witness.  See, e.g., Jefferies v. Wainwright, 794 F.2d 1516, 1520 (11th Cir. 1986) ("[c]ounsel's inability to impeach [a prosecution witness] with the suppression transcript itself did not deprive appellant of an effective defense").

Here, Thomas was able to use the audiotape to effectively impeach the witness in question, Sergeant Alan Semple.  On cross-examination, Semple agreed that it was possible that he could have testified as Thomas suggested at the suppression hearing, and that he recognized that Thomas "obviously [had] some sort of a transcript there."  Trial Tr. vol. 3, 155.  Thus, even without the transcript, Thomas was able to effectively confront Semple with his allegedly inconsistent statement.

It was not unreasonable for the NHSC to conclude that, under these circumstances, the audiotape was an adequate alternative to the transcript so that denying Thomas access to it did not violate his right to due process.  See Jefferies, 794 F.2d at 1520 ("We do not concede, however, that functional alternatives are limited to those devices which allow impeachment by a witness' own words . . . .  Thus, a functional alternative to a typed transcript includes any device which allows a defendant to

present an effective defense"); United States v. Vega, 589 F.2d 1147, 1150 (11th Cir. 1978) (finding no due process violation where "[t]he value of the [suppression hearing] transcript to the appellant was minimal").[5]  Accordingly, while Thomas's impeachment of Semple may have been more effective with a transcript of the suppression hearing, it does not follow that the NHSC unreasonably applied federal law in upholding the trial court's refusal to give him one.[6]  It did not.

### b.    Harmless error

Furthermore, even if the trial court did violate Thomas's due process rights by refusing him the transcript, he would not be entitled to habeas corpus relief because that violation was harmless.  An error is harmless in the habeas corpus context unless it "'had substantial and injurious effect or influence in

---

[5]In contrast, where courts that have found that the denial of a suppression hearing transcript was constitutional error, there has generally been both a showing of high need and a complete lack of available alternative devices.  See, e.g., United States v. Devlin, 13 F.3d 1361, 1363-65 (9th Cir. 1994) (holding that suppression hearing transcript should have been provided when there were many inconsistencies between the testimony in the two proceedings, the government itself requested a copy of the transcript, and the defendant was given no alternative to the transcript prior to trial).

[6]Thomas also contended at oral argument that the Britt standard should be applied differently when the defendant is proceeding pro se.  He does not provide any support for that principle, which is certainly not "clearly established."

determining the jury's verdict.'" Fry v. Pliler, 551 U.S. 112, 116 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). Here, although Thomas argues that impeaching Semple with the transcript would have resulted in his acquittal, the record is squarely to the contrary.

As just discussed, even without the transcript, Thomas confronted Semple with his supposedly inconsistent statement, and the witness acknowledged that he may have testified to that effect. Moreover, any inconsistency between Semple's testimony at the suppression hearing and at trial was minimal at best, and therefore did not bear significantly upon his credibility as a witness or, for that matter, any other material issue in the case. Accordingly, the court cannot conclude that the lack of a transcript had any influence on the jury's verdict. See, e.g., United States v. Rosales-Lopez, 617 F.2d 1349, 1356 (9th Cir. 1982) (holding that the trial court's use of an erroneous legal standard in determining whether the defendant should have been provided with a transcript of a suppression hearing was harmless error because "[t]he defense . . . can point to only two minor inconsistencies between the testimony at the suppression hearing and the testimony given at trial").

So, even if the NHSC's decision concerning the suppression hearing transcript were an "unreasonable application of" clearly

25

established federal law, Thomas would not be entitled to habeas corpus relief because the lack of a transcript did not have a substantial and injurious effect on the jury's verdict.  The Warden is entitled to summary judgment on this claim.

## B.   Claims not adjudicated on the merits

The NHSC did not reach the merits of Thomas's remaining claims.  Therefore, the claims are reviewed de novo.  Cone, 129 S. Ct. at 1784.

### 1.   Limitation of Thomas's opening statement

Thomas argues that the trial court violated his constitutional right to a fair trial by precluding him from mentioning, in his opening statement, his theory that his prosecution was the product of a conspiracy among various state actors, including a prosecutor who had fabricated evidence against him.  The Warden argues that a defendant does not have a federal constitutional right to make an opening statement, and that therefore the trial court's limitation on Thomas's opening statement cannot be the basis for habeas corpus relief.  The Warden further argues that even if Thomas did have a right to make an opening statement, the trial court did not violate that right because Thomas was unable to proffer any evidence

supporting the theory he wished to raise.[7]  Assuming that a
defendant has a constitutional right to make any opening
statement, a right which has not been recognized by the Supreme
Court, Thomas did not articulate any evidence supporting his
conspiracy theory to the trial court, despite repeated
opportunities to do so.  Therefore, the trial court acted
properly in precluding any reference to that theory in Thomas's
opening statement.

The Warden is correct that there is no Supreme Court
decision establishing a defendant's constitutional right to make
an opening statement.  Some federal courts, however--including
our court of appeals--have recognized the existence of such a
right.  See United States v. Hershenhow, 680 F.2d 847, 858 (1st
Cir. 1982) ("provided he confines himself to a discussion of what
he hopes to show, a defendant in a criminal case has a right to
make an opening [statement] regardless of whether he intends to
call witnesses"); see also United States v. Zielie, 734 F.2d
1447, 1455 (11th Cir. 1984); Jennings v. United States, 431 A.2d
552, 560 (D.C. Cir. 1981).  Because the Warden is entitled to
summary judgment on this claim for the independent reason that

---

[7]The Warden does not challenge whether Thomas properly
exhausted his remedies with regard to this claim, so this court
simply assumes without deciding that he has.

the trial court did not improperly limit Thomas's opening statement, the court will assume without deciding that a criminal defendant has a constitutionally protected right to make an opening statement.

On the first day of trial, the court advised Thomas that although he was not required to inform the court as to the content of his opening statement, the court would sustain the prosecutor's objection to any inappropriate remarks.  The court invited Thomas to "test the waters" by telling the court anything he thought may be objectionable.  Trial Tr. vol. 1, 65, May 7, 2001.  Thomas responded that he intended to make the following remark in his opening statement:  "I intend to demonstrate to you that the prosecution has molded and manufactured evidence in this case in an effort to cover up mistakes, police misconduct, and obtain a conviction in this case."  Id. at 65-66.

In response, both the prosecutor and the court asked Thomas what evidence he intended to put forth in support of that theory, explaining that his opening statement had "to be based on evidence that you are prepared to present through competent, relevant testimony from witnesses."[8]  Id. at 66.  The closest

---

[8]A criminal defendant could conceivably interpret this particular statement to suggest that he or she carried a burden of proof at trial, which is of course neither correct nor constitutionally permissible.  Thomas has not advanced that

Thomas came to answering this question was his statement that he "expected the jury to be able to obtain a reasonable inference from my questions."  Id. at 68.

This persisted even though the court repeatedly explained to Thomas that he could only discuss matters in his opening statement on which he planned to introduce evidence.  The court's explanations included the following:

> You can't talk about something unless you are prepared to present evidence . . . .  Id. at 67;

> I'm asking you what evidence there is to present to show that there's -- that they've concocted evidence somehow.  Id. at 68;

> But that doesn't mean that the defendant can come out with an opening statement and sort of lambasting [sic] of the State without a basis standing behind it. Id. at 70;

> I can't permit an opening statement to be made that's not a proper, responsible opening statement that bears a relationship directly to the evidence that's going to be presented in the court of the trial consistent with it.  Id. at 71; and

> I'm saying you can't talk about something that you -- just sort of a pie in the sky.  You have to have -- back that with -- with being prepared to present credible, relevant, admissible evidence.[9]  Id. at 77.

---

argument here, and as explained infra, the trial judge's handling of the defendant's opening statement does not violate Thomas's constitutional rights.

[9]See supra n.8.

Despite these admonitions, during his opening statement, Thomas repeated the exact same phrase he had previewed for the court:  "I intend to demonstrate to you that the prosecution has molded and manufactured evidence in this case in an effort to cover up mistakes, police misconduct, and obtain a conviction in this case."  Id. at 91.  After the prosecutor objected, the court again asked Thomas, at sidebar, what evidence he planned to introduce to support that argument, but ultimately was not satisfied that there was any.  The court therefore instructed the jury to disregard Thomas's remark.

"The purpose of an opening statement 'is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole.'"  Hershenhow, 680 F.2d at 857-58 (quoting United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J. concurring)); see also Arizona v. Washington, 434 U.S. 497, 513 n.32 (1978).  Thus, an opening statement "should not refer to matters that are not to be presented as evidence," United States v. Taren-Palma, 997 F.2d 525, 532 (9th Cir. 1993), overruled on other grounds by United States v. Shabani, 513 U.S. 10 (1994), and, if this occurs, the trial court can take appropriate steps to remedy it, Hershenhow, 680 F.2d at 858.

30

Here, as just discussed, Thomas failed to articulate to the trial court's satisfaction--despite repeated opportunities to do so--the evidence he intended to adduce to support his defense that the prosecution had "molded and manufactured evidence" of his guilt to cover up police misconduct.  In instructing the jury to disregard that portion of Thomas's opening statement, then, the trial court was properly limiting the statement to a discussion of the anticipated evidence.

At oral argument in this court, Thomas argued that he intended to show that the arresting officers lied when they claimed that Thomas was "sweaty" and had "wet shoes" when he was arrested.  It is not clear how this is evidence, or how it would tend to support his theory of misconduct by the prosecutor but, those problems aside, Thomas concedes that he did not directly offer this explanation to the trial court in arguing over his opening statement.  Instead, he argues that he referred the trial court at that time to his pending motion to dismiss, which did make that argument.  That is incorrect; this court has reviewed the motion, and it contains no such allegations.  See Ex. 2 at 1-28.  The record conclusively shows, then, that Thomas failed to describe for the trial court any admissible proof for his theory of fabricated evidence.  Even if he had a constitutional right to give an opening statement, then, the trial court did not violate

31

that right by limiting the statement to matters for which Thomas could conjure some evidentiary support.  Therefore, the Warden is entitled to summary judgment on Thomas's claim regarding the trial court's limitation on his opening statement.

### 2.    Ineffective assistance of standby counsel

Thomas argues that the trial court denied him the effective assistance of counsel by allowing him to proceed with standby counsel, Weintraub, who had an actual conflict of interest.  The Warden argues that because Thomas failed to properly exhaust his state-court remedies as to this claim, he cannot raise it here, and that it is without merit in any event because Weintraub did not have an actual conflict of interest.  While this court disagrees that Thomas failed to exhaust this claim, it is indeed without merit, because (a) since, as already discussed, Thomas validly decided to proceed pro se, he had no right to the "effective assistance" of standby counsel and (b) even if he did, the record provides no support for the proposition that Weintraub's conflict of interest--even if she had one--adversely affected her performance.  So the Warden is entitled to summary judgment on the ineffective assistance of standby counsel claim.

32

### a.  Exhaustion

To be eligible for federal habeas relief, Thomas must show that he has exhausted all of his state court remedies, or that he is excused from exhausting those remedies because of an absence of available or effective state corrective processes.  See 28 U.S.C § 2254(b); see also Adelson v. DiPaola, 131 F.3d 259, 261-62 (1st Cir. 1997).  A petitioner's remedies under state law have been exhausted when the state's highest court has had an opportunity to rule on the petitioner's claims.  See Lanigan v. Maloney, 853 F.2d 40, 42 (1st Cir. 1988); see also Picard v. Connor, 404 U.S. 270, 275 (1971).  To show that he has given the state's highest court that opportunity, a petitioner "must show that he tendered his federal claim in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question."  Clements v. Maloney, 485 F.3d 158, 162 (1st Cir. 2007) (internal quotation marks and citations omitted).

Here, as discussed in Magistrate Judge Muirhead's Report and Recommendation, which was later approved by this court, Thomas properly exhausted his claim that Weintraub's conflict of interest deprived him of his Sixth Amendment right to effective assistance of counsel.  Thomas presented this claim to the NHSC in his Petition for Writ of Habeas Corpus filed on December 6,

2004, which included an allegation that "Weintraub continued to act as standby counsel despite her stated 'actual conflict of interest' with the Petitioner and subsequently allowed this 'conflict' to interfere with the Petitioner's representation of himself at trial," citing, among other federal constitutional provisions, the Sixth Amendment.  This was sufficient to fairly present the claim to the NHSC.  See Clements, 485 F.3d at 162 (a federal claim is fairly presented to the state court when a habeas petitioner "cit[es] a provision of the federal constitution" or "present[s] a federal constitutional claim in a manner that fairly alerts the state court to the federal nature of the claim").  Therefore, Thomas properly exhausted this claim. Because the NHSC did not consider this claim on its merits, the court's review of this claim is *de novo*.

**b.   Merits**

Five days before his trial began, the Superior Court held an expedited hearing on Thomas's request to replace Weintraub, at which Thomas accused her of "professional misconduct."  Hr'g Tr. 6, May 2, 2001.  At the hearing, Weintraub stated that she had recently moved to withdraw as counsel, and informed the court that in light of Thomas's allegations against her, she was in a position of conflict.  The prosecutor agreed that Weintraub had

grounds to withdraw, but noted that in light of the upcoming trial date, Thomas should have to proceed without standby counsel if that happened.  Thomas explained that, although he wished to have new standby counsel appointed, he would prefer to proceed with Weintraub rather than without any standby counsel.  The judge viewed Thomas's complaint against Weintraub as "an attempt to delay" the trial and denied both Weintraub's motion to withdraw and Thomas's motion to replace her.  Id. at 12.

On the first day of trial, Weintraub again raised her "actual conflict of interest" in light of a claim of ineffective assistance of counsel by her (and others) that Thomas had raised in a pending motion to dismiss.  Trial Tr. vol. 1, 48.  The court explained that it would not appoint a new standby counsel at such a late date.  Thomas again expressed his preference to keep Weintraub as standby counsel rather than proceed without standby counsel.  The court denied Weintraub's motion to withdraw, noting the very limited role that she would play as standby counsel.

The Sixth Amendment affords a defendant the right to the effective assistance of counsel in all state criminal prosecutions which may result in the loss of his liberty. Strickland v. Washington, 466 U.S. 668, 684-86 (1984).  But "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial

of 'effective assistance of counsel.'" Faretta, 422 U.S. at 834
n.46; see also McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984).
As Thomas concedes, he had no constitutional right to the
assistance of standby counsel. See Pet. Obj. 13 (citing United
States v. Morrison, 153 F.3d 34, 55 (2d Cir. 1998)). "[W]ithout
a constitutional right to standby counsel, a defendant is not
entitled to relief for the ineffectiveness of standby counsel."
Morrison, 153 F.3d at 55; see also Simpson v. Battaglia, 458 F.3d
585, 597 (7th Cir. 2006); United States v. Schmidt, 105 F.3d 82,
90 (2d Cir. 1997).  Thus, Thomas cannot state a cognizable claim
for denial of his Sixth Amendment right to effective assistance
of counsel on the basis of Weintraub's alleged conflict.[10]

     Even if standby counsel's performance could provide a basis
to an ineffective assistance of counsel claim, Thomas has not
demonstrated any grounds for that claim.  To establish a claim
for ineffective assistance of counsel, a petitioner must satisfy
the two-element Strickland standard, namely, "(1) deficient
performance by counsel (2) resulting in prejudice." Malone v.
Clarke, 536 F.3d 54, 63 (1st Cir. 2008) (citing Rompilla v.

---

          [10]Thomas argues that although he did not have a
constitutional right to standby counsel, once the trial court
appointed standby counsel, he had the right to the effective
assistance of counsel.  Thomas does not provide any support for
that argument, which is directly contrary to the case law just
discussed.

Beard, 545 U.S. 374, 380 (2005)).  To satisfy the prejudice element, a petitioner must show that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

If, however, "the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance," then the prejudice element is presumed. Id. at 692 (internal quotation marks and citation omitted); see also Mickens v. Taylor, 535 U.S. 162, 171 (2002) (a defendant must show that the conflict "actually affected the adequacy of his representation"); United States v. Burgos-Chaparro, 309 F.3d 50, 53 (1st Cir. 2002) ("some adverse action or inaction is required that can be traced to the conflict in loyalty").

As an initial matter, it is doubtful that Weintraub was suffering from an actual conflict of interest at any point prior to or during Thomas's trial.  Again, Weintraub believed she had such a conflict due to Thomas's allegations of ineffective assistance of counsel and his stated plan to use that as a basis of his defense--including by calling her as a witness.  The trial court, however, foiled that plan, precluding Thomas from arguing ineffective assistance or calling Weintraub to testify.  In

addition, although Thomas eventually filed a grievance against Weintraub with the Professional Conduct Committee, he did not do so until after the trial.

Without a grievance on file, and without ineffective assistance of counsel as an issue at trial, there may well not have been an actual conflict at that point.  There was likely a "mere theoretical division of loyalties," which, as just discussed, would not relieve Thomas of his burden to show prejudice--a reasonable probability that but for Weintraub's alleged errors, the results of his trial would have been different--to succeed on his ineffective assistance of counsel claim.  Mickens, 535 U.S. at 171.  The record provides no support for that, which is fatal to Thomas's claim that Weintraub was constitutionally ineffective (unless she had an actual conflict).

Even assuming that Weintraub had an actual conflict of interest at some point before the trial ended, his claim that she was constitutionally ineffective still fails, because there is no indication in the record that the conflict adversely affected her performance.  Thomas argues that the adverse effect of the conflict on Weintraub's performance manifested itself in the following ways:  (i) he modified his opening statement to avoid alienating Weintraub; (ii) Weintraub reluctantly, and only when specifically requested, provided information as to objections or

other issues at trial; (iii) Weintraub did not take a larger role
in the case after Thomas became exhausted midway through the
trial; (iv) Weintraub convinced him not to call certain witnesses
whose testimony would have shown that she was sabotaging his
case, and (v) Weintraub did not assist him in managing witnesses.
See Ex. 10(A) at 41-42, 50-57, 59-60, and 63-66.

Most of these arguments misapprehend the role of standby
counsel which, as the title suggests, is "to aid the accused if
and when the accused requests help." McKaskle, 465 U.S. at 176
(emphasis added).  Thomas does not allege, and the record does
not show, that Weintraub ever refused his requests for assistance
during trial.  Nor is there any record support for Thomas's
allegations that Weintraub interfered with his trial tactics,
such as the content of his opening statement or the witnesses he
called.  Indeed, Thomas's "modification" to his opening
statement--which he characterizes as excluding references to
ineffective assistance of counsel and a police conspiracy--were
ordered by the court, as already discussed at length.

There is no support for Thomas's claim that Weintraub's
actual conflict in representing him--assuming dubitante that she
had one--adversely affected by her performance as standby
counsel.  The Warden is entitled to summary judgment on Thomas's
claim that Weintraub was constitutionally ineffective.

### 3.    Ineffective assistance of appellate counsel

Thomas also claims ineffective assistance by his appellate counsel, Rothstein.  Thomas bases this claim on two separate deficiencies in Rothstein's representation:  (1) he had previously been a colleague of Igram, an attorney who had briefly represented Thomas at the trial level and against whom Thomas wanted to pursue an ineffective assistance of counsel claim, and (2) Rothstein refused to take certain actions and pursue certain avenues of appeal that were requested by Thomas.[11]  The Warden argues that because Rothstein withdrew from representing Thomas on his claim that Igram was ineffective, there was no conflict of interest.  The court agrees with the Warden and, furthermore, finds Thomas's other theory that Rothstein was ineffective to be without merit.  Because the NHSC did not consider Thomas's claim of ineffective assistance of appellate counsel on its merits, this court reviews it *de novo*.[12]

---

[11]Thomas's attorney did not address this claim in his objection.  Thomas raised the issue in his "Pro Se Supplemental Objection," but did not include any argument in his objection. Instead, he asked the court to review various pro se memoranda in the record that addressed the claim.  The court has reviewed the memoranda and has interpreted Thomas's arguments in the light most favorable to him.

[12]As with his claim against Weintraub, Thomas presented this claim to the NHSC in his Petition for Writ of Habeas Corpus.

Thomas's claim that Rothstein had a conflict of interest is easily resolved.  Rothstein repeatedly explained to Thomas he did not believe that Thomas's claim against Igram had any merit, especially because she did not actually represent him at trial.  Because of his disagreement with Thomas on this point, and also because of his former professional relationship with Igram, Rothstein moved to withdraw as Thomas's appellate counsel as to any claim of ineffective assistance by Igram.  The NHSC granted that motion, leaving Rothstein as Thomas's appellate counsel as to all other claims.  Because Rothstein withdrew from representing Thomas on the very claim that allegedly presented a conflict, the conflict-based claim for ineffective assistance of appellate counsel has no merit.

In his pro se memorandum, Thomas asserts numerous other deficiencies in Rothstein's representation, including his refusal "to compare audio recordings of trial to trial transcript to correct specific errors," his "failure to order transcripts," his failure "to effectively argue bail pending appeal," and his failure "to investigate, appeal and/or argue the sentencing errors by" the trial court.  See Pet. Supp. Obj. 8.  As an initial matter, Thomas's claims of ineffective assistance of counsel as to bail and sentencing issues are moot for purposes of

41

this proceeding, since his appeal has been denied and he has
finished serving his sentence.

Regardless, Thomas fails to show that any of Rothstein's
actions constitute a "deficient performance by counsel."  As the
Supreme Court has held, "counsel has a duty to make reasonable
investigations or to make a reasonable decision that makes
particular investigations unnecessary.  In any ineffectiveness
case, a particular decision not to investigate must be directly
assessed for reasonableness in all the circumstances, applying a
heavy measure of deference to counsel's judgments." Cullen, 131
S. Ct. at 1427 (quoting Strickland, 466 U.S. at 691).
Rothstein's decision not to investigate every alleged error noted
by Thomas is reasonable on its face.  To the extent Thomas argues
that Rothstein should have raised other claims in his appeal, he
ignores "the wide latitude counsel must have in making tactical
decisions." Strickland, 466 U.S. at 689.

Moreover, even if Rothstein's performance were deficient,
Thomas has failed to demonstrate a "reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different." Id. at 694.  Thomas
simply asserts, without elaboration, that his appeal would have
been successful with better appellate counsel.  That is not
enough to satisfy the prejudice element of Strickland.  See

Richter, 131 S. Ct. at 792 ("[t]he likelihood of a different result must be substantial, not just conceivable").

Accordingly, the Warden is entitled to summary judgment on Thomas's claim of ineffective assistance of counsel by Rothstein. In addition to his pro se arguments in support of that claim, Thomas makes two additional pro se claims in his supplemental memorandum.  The court has reviewed those claims and concludes that they, too, are without merit.

## IV.  **Conclusion**

For the foregoing reasons, the court grants the Warden's motion for summary judgment[13] and denies Thomas's motion for summary judgment.[14]  Because Thomas has failed to make a substantial showing of the denial of a constitutional right, the court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Rule 11, Federal Rules Governing Habeas Corpus Cases Under Section 2254; First Cir. LR 22.0.  The clerk shall enter judgment accordingly and close the case.

---

[13]Document no. 51.

[14]Document no. 67.

43

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 21, 2012

cc:  Terry Thomas, pro se
     Lawrence A. Vogelman, Esq.
     Elizabeth C. Woodcock, Esq.
     Stephen D. Fuller, Esq.
     Susan P. McGinnis, Esq.